RUSSELL M. WHITNEY and Others, Plaintiffs, *v.* THE CITY of OLEAN, Defendant.

*Contract to furnish a well to a city — evidence as to sufficiency of tests made.*

In an action brought by a contractor, to enforce a written agreement to furnish a well to supply the defendant city with water, the question at issue being whether the well had been fully and fairly tested and had produced the average quantity of water called for by the contract, the Appellate Division was of opinion that, considering the criticisms upon the tests actually made, together with the evidence which was offered, showing that the results indicated by

the tests were unreliable, as well as the testimony tending to show that the capacity of the well was equal to the quantity mentioned in the provisions of the contract, or some of them, a question of fact was presented which should have been submitted to the jury, and that the trial court erred in directing a verdict in favor of the defendant.

MOTION by the plaintiffs, Russell M. Whitney and others, for a new trial upon a case containing exceptions, ordered to be heard at the Appellate Division in the first instance, upon the verdict of a jury in favor of the defendant rendered by direction of the court after a trial at the Cattaraugus Trial Term.

This action was brought against the city of Olean to recover upon a contract made by the plaintiffs with the water commissioners of that city to turn over to the city a certain well which they had sunk; and if such well produced over a half million gallons of water per twenty-four hours, more than the city wells then in use, the plaintiffs were to be paid a stipulated price therefor, to be increased by fixed amounts should the quantity of water produced by their well average one million gallons and over, in excess of the quantity produced by the city wells. The plaintiff claimed that the defendant had failed to make an adequate test of the well.

*Fred L. Eaton,* for the motion.

*A. J. Hastings,* opposed.

HARDIN, P. J.:

On the 21st of August, 1895, the plaintiffs entered into a written contract with the board of water commissioners of the defendant, which is set out in the complaint. Prior to the execution of the contract there had been an agreement between the parties to sink a certain well for supplying the city with water and doing other work, and there had been a failure to complete that contract, although the plaintiffs had performed certain work under that agreement; and by way of adjustment, and to terminate all former contracts, and to settle all matters between the parties, the plaintiffs stipulated to transfer and set over to the city all their right, title and interest in and to any and all work done in sinking such well or wells, and to make no claim for anything done or furnished under that agreement, except as they may be entitled to the same under the conditions

named in the contract of August twenty-first. The latter contract contained the following stipulations : " Second parties to make a test of the wells from which city water is now taken for a certain time as they deem proper, and to keep a record of how much water is pumped from them each and every twenty-four hours; then they agree to put the suction into the Cook well, so called, and shut off all other wells, and test the Cook well to determine the difference in the quantity of water produced by the Cook well *for ten days* over and above that pumped from the present city wells under said test, the test to commence after pumping off the head of water on said Cook well for a period of forty-eight hours. In case under said tests the said Cook well does not average at least one-half million gallons per twenty-four hours more than the present city wells, nothing shall be due or payable to first parties, and they or either of them shall be entitled to nothing. In case said Cook well will average per twenty-four hours one-half millions and under one million gallons more than the present city wells, the first parties shall be paid one thousand dollars; in case said additional average is one million gallons and under one and one-half million, they shall be paid one thousand five hundred dollars ; if one and one-half millions and under two million, seventeen hundred fifty dollars ; if two million and under two and one-half, two thousand dollars ; if two and one-half million and under three million, twenty-two hundred and fifty dollars; if three million and under three and one-half million gallons, twenty-five hundred dollars; if three and one-half million gallons or more, twenty-seven hundred and fifty dollars. Commissioners are to furnish and put the suction pipe in the Cook well, and the expense of said suction pipe and connecting, special castings and grading is to be deducted from the price paid for the well, whether the said price paid be one thousand dollars or twenty-seven hundred fifty dollars."

It is averred in the complaint that the plaintiffs have kept all the stipulations of the agreement on their part, and that the defendant has neglected and refused to perform said contract. The complaint further avers : " That the defendant has not made, and refuses to make, any adequate or sufficient test of said well according to the terms of said contract, and has not exhausted and refuses to exhaust the water in said well, and refuses to ascertain the quantity of water

that said well will produce ; and has neglected and refused, and does neglect and refuse, to make a test or to employ any sufficient or other test to ascertain the quantity of water said well will produce, or to demonstrate the amount of water that said well will produce daily. And the plaintiffs further allege upon information and belief that said well has and will produce, if reasonably and properly tested, from six to six and one-half million gallons of water every twenty-four hours ; that defendant has taken possession of said well under the terms of said contract."

The answer of the defendant contains several denials, and alleges that the board of water commissioners on the 21st of August, 1895, " entered into a written contract with the plaintiffs substantially in the words and figures as set forth in the plaintiffs' complaint, and that the defendant has fully and in all respects complied with all the conditions, covenants and agreements therein contained on its part to be performed, and has fully and fairly tested said well in accordance with the provisions of said contract. And that said Cook well under said tests did not average one-half million gallons of water per twenty-four hours more than the city wells on the first day of August, 1895, and at the time said tests were made. And that said Cook well did not and could not produce an average of one million gallons of water per twenty-four hours."

The plaintiffs gave evidence tending to indicate that upon a certain test made of the Cook well it yielded " at the rate of 6,727,780 gallons for twenty-four hours." There was some evidence given tending to indicate that the plaintiffs had no notice from the defendant that it or its agents were " to make a test." The old well of the city was about twenty-six feet and the well of the plaintiffs was about forty feet deep.

When the plaintiffs rested the defendant moved for a nonsuit, and stated as one ground therefor " that the water produced, or capable of being produced from the Cook well under the test, does not average at least one-half million gallons for twenty-four hours more than the city wells described in the contract average." The motion was denied and the defendant excepted.

At the close of the evidence the question whether the case should have been submitted to the jury depended largely upon the interpretation to be given to the evidence relating to the tests which

had been made of the plaintiffs' well. Exhibit A and Exhibit C ·
and Exhibit 1 indicate the data which were relied upon by the
defendants to show that their test was adequate, and that by reason
thereof nothing was due to the plaintiffs under the contract. By
the contract it was provided that a test of the wells from which the
city water was being taken for a certain time, should be made as
"they deem proper." In Exhibit C the test of the city wells for
twenty-four hours appears and must be taken to represent such test
as the city deemed proper. The statement of this test is defective
in not showing the steam pressure and the lift of water in the well
at different intervals of time during the twenty-four hours. The
steam pressure, knowing the size of the cylinder of the engine, would
indicate the horse power used; and the depth at which water was
drawn would indicate whether the water was held at an average stage
during the test, and what that stage actually was during the different
hours of the test, also the date of the test for comparison with the
date of the Cook well. All these data are essential for a comparison
with the yield of the Cook well.

Again, the agreement provides for putting the suction into
the Cook well, so called, to determine the difference in the quan-
tity of water produced by the Cook well for ten days, over
and above that pumped from the city wells under said test,
the test to commence after pumping off the head of water on
said Cook well for a period of forty-eight hours. This condition
seems to have called for a ten days' test of the Cook well, and it is
quite apparent that ten days' continuous test could be the only one
that would at all represent the flow, as the flow must be continuous
to be of any service or value. It appears by the testimony and
Exhibits A and 1 that only two tests were made, and these were not
continuous, as one was made September 29, 1895, and the other
December 15, 1895. It may well be doubted whether these tests were
in accordance with the requirements of the conditions of the contract.
Again, the tests were incomplete and valueless for the purpose of
comparison for the following reasons : There is no water found in
the ground except such as percolates from rains. Any well will
draw water from the surrounding ground out to points represented
by a circle or disk, so to speak, which defines the extent of the slope
or grade of the surface of the ground water, and to a point where the

· difference of level or head in a well is just equal, in the operation of the law of gravity in drawing the water, to the frictional resistance of the particles of the soil in holding the water back. Therefore, it follows that if the well is located in water-bearing strata the deeper down the water is pumped the greater the flow, until the point is reached where the force of gravity, due to the head in the well, is just equal to the frictional resistance in the water-bearing strata. It appears by the testimony that there were two city pumps, one of the capacity of 1,000,000 gallons per diem — a Worthington — the other 2,000,000 gallons — a Holley. The two tests, Exhibit C and No. 1, were made with the Worthington pump. The capacity of the pump was known to be $16\frac{7}{10}$ gallons per revolution. A twenty-four hour test was made of the city well, calling for 66,607 revolutions and 1,112,332 gallons per twenty-four hours, but no steam pressure or depth in well was given. In the other test, or No. 1, of the Cook well, practically the same number of revolutions was given, being 69,618, and the result must, of necessity, be the same as to the delivery, or actually 1,162,620 gallons. The test does not show the steam pressure or the depth pumped. The result could easily have been determined before the test was made. All that was necessary was to give the same number of revolutions, and the result was known before the start. As this pump was only a 1,000,000 gallon pump, any test by it could by no possibility reach up to the limit of 3,000,000 gallons difference, as provided for in the agreement. Again, taking the test Exhibit A, the deeper the water was pumped in the Cook well the more steam pressure was required. The area or capacity at each stroke was known. The test showed that the steam power or pressure was less at the end of the test than at the beginning. The test of December 15, 1895, Exhibit A, showed that it was possible to get 1,638 average revolutions per hour out of the pump, but from noon till night they ran from 1,103 down to 1,055. The fall in steam pressure showed that no effort was made to increase the power when the well was pumped deeper, the steam pressure being lower at the end of the test than at the beginning. The record shows that it was assumed that 28 feet was the full depth at which water could be drawn. This is not the fact, as it is a natural law, well known among hydraulic engineers, that water may be raised 32 feet at sea level, and that 1/100

should be deducted from this lift for every 262 feet difference of level above tide. Again, it was only possible to make a complete test by using both pumps, as their combined capacity was only equal to the difference claimed, *i. e.*, 3,000,000 gallons.

Considering the foregoing criticisms upon the tests actually made, together with the evidence which was offered showing that the results indicated by the tests were unreliable, as well as the testimony tending to show that the capacity in the Cook well was equal to the quantity mentioned in the provisions of the contract, or some of them, we are of the opinion that a question of fact was presented which ought to have been submitted to the jury. We think the trial court fell into an error in refusing to submit the questions of fact to the jury, and that the plaintiffs' exceptions should be sustained and the verdict set aside and a new trial ordered.

All concurred.

Plaintiffs' exceptions sustained, verdict set aside and a new trial ordered, with costs to the plaintiffs to abide the event.