## WHITNEY et al. v. CITY OF OLEAN.

(Supreme Court, Appellate Division, Fourth Department.   November 22, 1899.)

CONTRACT—CONSTRUCTION—QUESTION FOR COURT.

Plaintiff contracted with the defendant city that if a well dug by him did not, under the test hereinafter mentioned, supply a greater quantity of water than an existing city well, he should not be entitled to any compensation; that, in determining the flow of water, the city should make a test of the wells from which the city water was being taken, for a certain length of time, and keep a record of the amount of water pumped each 24 hours, and then it was to "put the suction into the well dug by plaintiff, and shut off all other wells, and test it." The contract provided that defendant should furnish and put the suction pipe into the new well, and that the expense was to be deducted from the price to be paid plaintiff. Defendant had in use two suction pumps. Suction pumps, in their practical workings, will not draw water more than 28 feet. Defendant's old well was only 26 feet deep, and the pumps were set down in the ground so that the top of the suction pipe was 6 or 7 feet below the level of the ground. In making the test of the new well, it was therefore impossible to exhaust the water from the well without lowering the pumps, which would have involved an expense of $6,000 or $7,000. Nothing was said in the contract about the expense of such lowering of the pumps, though the expense of the additional suction pipe, and putting it in, was provided for. *Held*, in an action to recover compensation, where defendant set up failure of the well to supply the required flow, that the construction of the contract was for the court, and that the defendant was not bound thereby to lower the pumps to make the test.

Hardin, P. J., dissenting.

Appeal from trial term, Cattaraugus county.

Action by Russell M. Whitney and others against the city of Olean. From a judgment in favor of the plaintiffs, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Prior to the 21st day of August, 1895, these plaintiffs made a contract with the defendant's commissioners to dig a well to supply water for the defendant city, and were engaged in the performance thereof. Upon that day they entered into a new agreement, which is the subject of this action. By that new agreement the former agreement was canceled, and the plaintiffs transferred to the defendant all the right, title, or interest in and to the well which was partly constructed by them under the former contract, and which was called the "Cook Well." The contract further provided: "Second party [defendant's commissioners] to make a test of the wells from which city water is now taken for a certain time, which they deem proper, and to keep a record of how much water is pumped from them each and every twenty-four hours. Then they agree to put the suction into the Cook well, so called, and shut off all other wells, and test the Cook well to determine the difference in quantity produced by the Cook well for ten days over and above that pumped from the present city wells under said test; the test to commence after pumping off the head of water on said Cook wells for a period of 48 hours. In case, under said test, the said Cook well does not average one-half million gallons per 24 hours more than the present city wells, nothing shall be due or payable to the first parties, and they, or either of them, shall be entitled to nothing." The contract then provided that, if the excess should be more than 500,000 and under 1,000,000 gallons, the plaintiffs should be paid $1,000; if 3,500,000 gallons, or more, $2,750. The contract also provided: "The commissioners are to furnish and put suction pipe in the Cook well, and the expense of said suction pipe and connecting said castings and grading is to be deducted from the price paid for the well, whether the price be $1,000 or $2,750. It is further agreed that, if the said (so-called) Cook well does not produce one-half million gallons of water more than the supply of the present city wells,

then, in that event, the plaintiffs shall remove the bricks, engines, and machinery or material of any kind from the premises, and shall fill up and agree to leave the premises in as good condition as found before the commencement of said well, all of which shall be done within a period of thirty days from the expiration of the test." Thereafter the defendants tested the city wells, which were found to produce about 1,000,000 gallons a day. They then transferred the suction from the city wells to the Cook well, so called, and tested that, which was found to produce about 1,200,000 gallons a day. The defendants had in their use two suction pumps, one with the stated capacity of 1,000,000 gallons a day, and the other with a stated capacity of 2,000,000 gallons a day. The testimony shows that a suction pump, in its practical working, will draw water only about 28 feet. These pumps were set down in the ground so that the top of the suction pipe was about 7 feet below the surface of the ground. The height of the cylinder, however, from which the 28 feet could be measured, was about 18 inches above the top of the suction pipe, so that the bottom of the suction pipe would be about 33½ feet below the surface of the ground. The Cook well was 40 feet in depth, while the city wells were only 26 feet in depth. It was impossible, therefore, to exhaust the water from the bottom of the Cook well by the use of the suction pump unless the pump was lowered 6 or 7 feet. These pumps were very heavy; weighing, the smaller one about 20 tons, and the larger one about 50 tons. They were placed upon a cemented stone foundation, and the undisputed evidence is that to lower the pumps so that, by the use of the suction, water could be drawn from the bottom of the Cook well, would cost between $6,000 and $7,000. The Cook well was very near the old city well. The change of the suction from the old city well to the Cook well was a matter of much less moment. Some digging was required to be done to keep the suction pipe down to the level of its attachment to the pump, to wit, about 7 feet below the surface of the ground; and, from the fact that the city wells were only 26 feet in depth, it would appear that additional pipe would have to be purchased or used upon the suction of the Cook well. The plaintiffs swear that, while digging the Cook well, one of the commissioners stated to them that they wanted the well deeper, because they proposed to lower their pumps. This evidence, however, was contradicted by the commissioners. Further facts appear in the opinion.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, and SMITH, JJ.

A. J. Hastings, for appellant.
Frederick L. Eaton, for respondents.

SMITH, J. The tests made by the defendants of the city wells were fairly made. Of this no question is presented by the plaintiffs. That the tests of the Cook well were fairly made, as far as they could be made without lowering the pumps, can, upon the evidence, hardly be questioned. The claim of the plaintiffs, however, is that that test could not fairly be made without lowering the pumps so as to exhaust the water in the Cook well. The defendants contend that the only test required by the contract was by a change of the suction from the city wells to the Cook well, and that no change in the position of the pumps was contemplated. Upon the trial the court ruled with the plaintiffs, and allowed the jury to say whether a fair test required by the contract could be made without lowering the defendants' pumps, and refused to charge that under the contract the defendants were not required to lower the pumps in making the required test. An exception to this refusal, and to the charge of the court upon this subject, presents the only question which this court is called upon to determine.

Upon an examination of the evidence in the case, and the questions of law involved, we are of the opinion that the defendants were not required, in making the test provided by the contract, to lower the pumps. This conclusion is reached, whether the construction of the contract presents a question of law for the court, or whether the contract be one of.those wherein the intent is to be gathered from collateral circumstances, and wherein the construction presents a question of fact. The contract provides that if, under "said tests," the Cook well does not average 500,000 gallons in excess of the city wells, no liability is created against the defendants. The words "said tests" are defined in the prior part of the contract. The defendants were to make a test of the city wells from which the city water was taken, and to keep a record of how much water was pumped from them each and every 24 hours. "Then it was agreed to put the suction in the Cook well, so called, and shut off all other wells, and test the Cook well, to determine the difference in quantity of water produced by the Cook well over and above that pumped from the present city wells under said test." It is difficult to conceive how the city could define more explicitly the test which was to determine its liability. After having made this provision, it could hardly be called upon to negative all other tests. Nor is it claimed here that anything agreed upon was omitted from this contract. The claim seems to be, because the test provided for by the contract is not as thorough as another test might be, that another clause should be, by the court or jury, written into this contract, providing that the defendants, in testing the Cook well, should also be required to lower their pumps. The city would probably never have executed such a contract. The test was prescribed in view of existing conditions. It is enough, however, that the contract does not so provide. It is the province of a court of law to construe contracts, not to make them.

Plaintiffs further urge that it was not contemplated that these tests should be made with the pumps as they then existed, because the test contemplated a possible flow of 4,500,000 gallons, and both pumps together are only of 3,000,000 gallon capacity. But to lower the pumps would not add to their capacity. It may well be that, if they found water in excess of 3,000,000 gallons, they would be willing to add other pumps. But it appears from the evidence that this 1,000,000-gallon pump, as guarantied, could pump about 1,500,000 gallons. In other words, the guarantied capacity of the pump is not its greatest capacity. The mere fact that these pumps have a guarantied capacity of only 3,000,000 gallons is not sufficient from which to conclude that it could not at least approximately be ascertained thereby whether the well would not yield 4,500,000 gallons.

Assume, on the other hand, that the construction of this contract, in view of the surrounding circumstances, presents a question of fact; we are still agreed that the facts do not justify the conclusion that the contract requires the defendants to lower these pumps in order to make a fair test of this well. The plaintiffs' construction of the contract can only be based upon two facts: First, that the water in the Cook well cannot be exhausted without lowering the pumps; second, that there was a conversation, about the time the

contract was made, as to an intention to lower the pumps. While this last conversation is disputed, we will assume, for the argument, that it occurred. Nevertheless the fact remains that while, in the contract, specific provision was made for the change of the suction, no provision was made for the lowering of those pumps, which would be an all-important provision, under the plaintiffs' theory. Again, the great expense in changing these pumps for a mere test is strong evidence that it was not contemplated. If the test failed, the work would be wholly lost to the defendants, because their own wells were only 26 feet deep, and their pumps were sufficiently low to exhaust all the water. Prior to this agreement the plaintiffs were, at a nominal expense, presumptively, testing their wells with a rotary pump. The court correctly charged that the defendants could not be required to make such a test. Would it be reasonable to hold that they contemplated an exhaustive test, at a cost of $6,000 or $7,000, with their suction pumps, when they were not required to make an exhaustive test with a rotary pump at a much less cost? Again, it is provided in the contract that the "commissioners are to furnish and put the suction pipe in the Cook well, and the expense of said suction pipe and connecting said castings and grading is to be deducted from the price paid for the well, whether said price be $1,000 or $2,750." It will be noticed that the expense of making the test, explicitly provided for by the contract, is made a charge against the contractor. Not a word is said about any expense for lowering those pumps. If that had been contemplated as a part of the contract, that part of the expense would naturally have been provided for, while providing for the expense of changing the suction. The irresistible inference to be drawn from all the facts is that both parties contemplated that with a deeper well the water would flow into a depth which could be reached by the suction with the pumps as they were then placed, and that the defendant's commissioners were contracting for a well which could be used with those pumps. The agreement was not to exhaust or make a thorough test of the Cook well, but to make a certain test. Upon the result of that test the liability of the defendants was by the contract made to depend.

The decision of this case upon the former appeal is not in conflict with the conclusion here reached. That decision was based purely upon the bona fides of the test made by the defendants. The construction of the contract was not determined. 29 App. Div. 49, 51 N. Y. Supp. 371.

Our conclusion is, therefore, that the construction of this contract, whether as a matter of law, or one of mixed law and fact, was for the court; that, under the contract, the defendant was not bound to lower the pumps in order to make the test required; and that the trial court erred in submitting this question to the determination of the jury. The judgment and order should therefore be reversed.

Judgment and order reversed, and a new trial granted, with costs to the appellant to abide the event. All concur, except HARDIN, P. J., dissenting.